# EXHIBIT 11

MASTER LOAN AGREEMENT 001 – 010322 USD

On this day of the 1st of March 2022 and by this agreement:

(i)   **International Portfolio Allocation Ltd.**, with registered office at 3rd Floor, One Capital Place, PO Box 10240, Grand Cayman, KY1–1002, Cayman Islands, (hereinafter referred to simply as "Borrower");

(ii)   **SPI Investment Fund SPC, for and on behalf of its SPI All Yields Fund (AYF) SP**, an exempted company registered as a segregated portfolio company headquartered at 4th Floor, Harbour Place, 103 South Church Street, PO Box 10240, Grand Cayman, KY1-1002 Cayman Islands, (hereinafter referred to simply as "Lender");

have agreed to execute the present 'MASTER LOAN AGREEMENT – 001 – 010322 USD' (the "Agreement"), which will be governed by the following updated and amended clauses and conditions. The terms and conditions within this Agreement supersedes any and all prior documents and agreements relating to a loan arrangement between the Parties:

## ARTICLE 1.   DEFINITIONS

In this Agreement the following expressions, except where there is a specific provision to the contrary or where the context otherwise requires, have the following meanings:

| | |
|---|---|
| "Advance" | means any amount, limited to the Facility amount, drawn by the Borrower in accordance with the provisions of this Agreement. |
| "Business Day" | means any day (other than a Saturday or Sunday) on which banks and foreign exchange markets are open in New York and such other place where any payment is required to be made or any act is required to be performed hereunder. |
| "Date of Drawdown" | means the date on which a drawdown is made pursuant to Article 2 of this Agreement. |
| "Payment Date" | means the date for both the Interest Payment Date and the Principal Payment Date. |
| "Interest Payment Date" | means the date coinciding with date upon which interest is repaid to the Lender. In the event that an Interest Payment Date shall be a day that is not a Business Day, then the Interest Payment Date shall be the next succeeding day that is a Business Day. |
| "Interest Period" | Interest Period means the period commencing on (and including) the applicable Date of Drawdown and ending on (but not including) the |

36

date upon which a request for repayment has been issued by the Lender (the date outlined within the respective Call Notice Request Form), and then each succeeding period commencing on (and including) the last day of the preceding Interest Period and ending on (but not including) the next succeeding request for repayment.

"Facility"                              means the aggregate amount of credit made available to Borrower.

"Term"                                  means the 10-year anniversary of the last day of the month following the month in which the first loan was funded under this Agreement. This implies that each loan will follow the same repayment structure as outlined in this Agreement under Article 3 below.

"Principal Repayment Dates"             means the repayment dates specified as such by the Borrower in the Notice of Drawdown.

"Tax" or "Taxes"                        shall include all present and future taxes, levies, imposts, duties, charges, fees, deductions and withholdings and any restrictions or conditions resulting in a charge.

For the purpose of this Agreement all interest, charges and so forth will be computed on the basis of a year of 360 days and the actual number of days elapsed.

## ARTICLE 2.    AVAILABILITY/FACILITY/DRAWDOWN/PURPOSE

1.      At the date of signing of this agreement and until further notice, Lender grants to the Borrower, who declares to have accepted from Lender, an advised and uncommitted credit Facility of US$ 100,000,000.00 (one hundred million USD), subject to the terms and conditions set forth herein.

2.      Subject to the provisions of this Agreement, the Borrower has the right to request to borrow Advances in the maximum aggregate amount of US$ 100,000,000.00 (one hundred million USD), after Lender accepts the borrowing loan request and has received a notice from the Borrower ("Notice of Drawdown"), in conformity with Exhibit A hereto (by telex or telefax to be confirmed in writing), indicating the proposed Date of Drawdown, the amount of the Advance and the Interest Period, which notice, once given, shall be binding and irrevocable.

3.      The Facility will be available to the Borrower throughout the term of this Agreement. The amount of any Advance shall not exceed US$ 100,000,000.00 (one hundred million United States Dollars), which constitutes the Facility amount made available by means of this Agreement.

4.      The Borrower will use the proceeds of the Facility for the specific purpose of facilitating financings primarily in the healthcare sector, but may also, with the consent of the Lender, allocate the amounts received in other sectors deemed to offer attractive risk adjusted return numbers.

37

## ARTICLE 3.    INTEREST

1.    Any loan amount received under this Master Loan Agreement shall carry a fixed annual interest as per the following terms:

A fixed annual simple interest rate of 12% per annum, until the Loan is repaid, canceled, extended, or otherwise amended. This monthly interest may be reset upon mutual agreement between Lender and Borrower on the last Banking Friday of each calendar month.

A)    The calculation is performed by the Lender's Administrator.

B)    Should the Borrower not be able to uphold this guarantee, an Event of Default is constituted as per Article 8 of this Agreement.

C)    These terms apply until the Loan is repaid, withdrawn or extended by the respective parties prior to such date.

2.    Interest Payment Date: Interest is not automatically paid out during the Term of the loan. Any repayment prior to the end of Term is payable as part of the redemption payment requested by the Lender at such time.

3.    If any Interest Payment Date would fall on a day which is not a Business Day then such interest period shall be extended to the next succeeding Business Day unless such Business Day falls on another calendar month, in which case such interest period shall end on the immediately preceding Business Day.

## ARTICLE 4.    REPAYMENT

1.    Payment Date - Interest and Principal Payment Date: A date when the Borrower shall pay the Lender a portion of the outstanding interest and principal as part of the redeemed amount requested by the Lender for the repayment of such amount at the time when a repayment is done. On a monthly basis, the Lender may request a repayment of up to 10% of the outstanding interest and principal amount provided the Lender provides a 70 (seventy) Business Day prior notice to the Borrower of any such requested repayment. Such payments shall be made to the account indicated by the Lender in this document.

2.    Payment Date - Interest and Principal Payment Date: The Borrower may prepay, and the Lender may request a partial or full repayment of the any outstanding loans in accordance with the Agreement as early as the Borrower or Lender chooses. The Lender should be given advance notice of at least seven (7) Business Days if the Borrower decides to prepay any portion of the interest and/or principal amount earlier then at the end of the Term. The full outstanding loan balance is fully repayable at the end of the Term unless the Lender gives the Borrower a written notice ninety (90) days before the end of the Term, causing an extension of the Agreement to take place. The loan can then be renewed for a period of five years with the same terms and conditions as this Agreement unless agreed in writing by both parties to revise any subject governing terms.

38

3.    Any repayment that is requested by the Lender as a payment against the amount outstanding under this Agreement is indicated as per the applicable Call Notice Request Form, according to Exhibit B hereto.

4.    All sums payable to the Lender hereunder shall be paid free and clear of any withholding taxes.

5.    This Facility is not revolving. Any amount repaid to Lender may not be re-borrowed.

6.    All payments shall be made on the Payment Date (Interest Payment Dates and Principal Payment Date), as applicable, no later than at 12:00 noon in lawful currency of the United States of America in freely transferable United States Dollars, to the following account of Lender (or at such other place or bank account as may be notified by Lender):

*Lenders Bank Account:*

Account holder: SPI Investment Fund SPC
Bank: ▮▮▮▮▮▮▮▮▮▮▮▮
Bank Swift: VPBVLI2X

Account number USD: ▮▮▮▮▮▮▮
IBAN USD: ▮▮▮▮▮▮▮▮▮▮

Account number CHF: ▮▮▮▮▮▮▮
IBAN CHF: ▮▮▮▮▮▮▮▮▮

Account number EUR: ▮▮▮▮▮▮▮
IBAN EUR: ▮▮▮▮▮▮▮▮▮

Account number GBP: ▮▮▮▮▮▮▮
IBAN GBP: ▮▮▮▮▮▮▮▮▮

Any wires to the Borrower by the Lender should be sent to Account 1 or Account 2, as outlined below, and indicated per each individual Notice of Drawdown, per Exhibit A:

*Borrower's Bank Accounts*

Account 1:

| Beneficiary Bank | ▮▮▮▮▮▮▮▮▮▮▮ |
|---|---|
| Bank Address | ▮▮▮▮▮▮▮▮▮▮▮ |
| ABA | ▮▮▮▮▮ |
| SWIFT | ▮▮▮ |
| Beneficiary Name | NCB (Cayman) Limited |
| Beneficiary Address | Po Box 31120, Elgin Avenue, The Pavilion, Cricket Square, Grand Cayman, KY1- 1205 |
| Beneficiary Account | ▮▮▮▮▮ |
| Bank to Bank Message | ▮▮▮ - (International Portfolio Allocation Ltd) |

**Account 2:**

| | |
|---|---|
| Correspondent Bank | ███████████████ |
| Correspondent Bank Address | ███████████████ |
| Correspondent SWIFT | ████ |
| Beneficiary Bank | ██████████ |
| Bank Address | ███████████████████ |
| SWIFT | ██████ |
| Beneficiary Bank Account | ██████ |
| Final Beneficiary Account Name | International Portfolio Allocation Ltd |
| Final Beneficiary Account Number | ████ |

## ARTICLE 5.    CONDITIONS PRECEDENT

1.    The obligations of Lender hereunder are subject to the condition that Lender shall have received, in a form and substance satisfactory to them, prior to the first loan disbursement:

a.    Certified copies of the Borrower's incorporation documents including all amendments thereto;

b.    Copies of all resolutions, authorizations, approvals, consents, licenses and legislation, if any, necessary or appropriate for entering into and performance under this Agreement by the Borrower; and

c.    A copy of the signatures of those persons authorized to execute this Agreement on behalf of the Borrower and of the persons authorized to sign or dispatch all notices, certificates and other documents on behalf of the Borrower in connection with this Agreement.

2.    Borrower shall provide all documents in English requested by the Lender at its own expense, and if necessary, provide for the translation into English, by a sworn translator, of all documents mentioned above which may not be directly written and issued in the English language, and shall have the same delivered to Lender upon request of the Lender.

## ARTICLE 6.    REPRESENTATIONS

The Borrower represents to Lender, prior to signing this Agreement and the funding of a loan under this Agreement, that:

a.    The Borrower has been validly incorporated and is validly existing under the laws of Cayman Islands and has all requisite corporate powers to carry on its business.

b.    The Borrower has all power and have obtained all the necessary approvals to enter into and perform its obligations under this Agreement and will take all the necessary actions to obtain, and to maintain valid all authorizations, approvals and consents of and/or registrations with all governmental and regulatory authorities in the jurisdictions in which it operates or any political subdivision thereof as shall be necessary or appropriate under the laws thereof in connection with the entrance into and performance of this Agreement by the Borrower.

40

c. Borrower is not in breach of or default under any agreement, document or other obligation to which it is a party or by which it is bound and no such agreement, document or other obligation will be contravened by the Borrower entering into this Agreement or by borrowing hereunder or performing any of its obligations hereunder.

d. No litigation, arbitration or administrative proceedings before or of any court, tribunal or governmental authority is presently pending or, to the best of the knowledge and belief of the Borrower, threatened against the Borrower or any of its respective assets which might adversely affect the Borrower's financial condition or the ability of the Borrower to perform their respective obligations hereunder and no such proceedings is presently pending or, to the best of the knowledge and belief of the Borrower, threatened to enjoin or restrain the execution or performance of this Agreement, or in any manner to question the laws and proceedings under which this Agreement is to be executed, performed or enforced, and none of the said laws and proceedings have been repealed, revoked or rescinded in whole or in part.

e. The Borrower has filed or delivered all tax returns which it is required by Law to file or deliver and has paid all taxes, assessments, fees and other governmental charges assessed against it or upon any of its properties, assets, income or franchises, and the Borrower is not in default in the payment of any taxes which is not disclosed in the financial statement referred to in paragraph (f) below.

f. The Borrower's audited financial statements will be provided once concluded (including the income statement and balance sheet) for each year during which the loan facility is utilized. The audit report intends to be done within 120 days after each calendar year to provide the lender with a Financial Statement prepared on a basis consistently applied and give a true and fair view of the results of its operations for that year and the state of its affairs at that date, and in particular accurately disclose all the Borrower's liabilities (actual or contingent).

g. There has been no material adverse change in the Borrower's financial condition since the date referred to in paragraph (f) above.

h. All information furnished by the Borrower in connection with the Facility is true, accurate and correct in all material respects and does not contain any untrue statement, nor omit to state any fact the omission of which makes the statements therein misleading in the light of the circumstances under which they were made, all expressions of expectation, intention, belief and opinion contained therein were honestly made on reasonable grounds after due and careful inquiry by the Borrower, and the Borrower has fully disclosed in writing to Lender all facts relating to the Borrower which the Borrower knows or should reasonably know and which are material for disclosure to Lender in the context of this Agreement.

i. Each of the above representations and warranties will be correct and complied with in all material respects so long as any sum remains to be lent or remains payable under this Agreement as if repeated then by reference to the then existing circumstances, except thatthe reference to accounts in paragraph (f) above shall be construed as a reference to the then latest available annual accounts of the Borrower.

## ARTICLE 7.    UNDERTAKINGS/COVENANTS

The Borrower hereby represents to the Lender that, as long as the Facility or any part thereof remains outstanding or any other sum is payable under this Agreement, that:

a.  it will provide Lender with its annual (consolidated if any) audited financial statements, as soon as available and in any event no later than 120 (one hundred and twenty) days after closing of the relevant accounts for the relevant year. Furthermore, the Borrower shall provide Lender with such other information, which Lender may reasonably request from time to time;

b.  the Borrower will promptly (but in any case no later than three days after it has become aware of such event) notify Lender of the occurrence of an Event of Default and provide Lender with full details of any steps which it is taking, or is considering taking, in order to remedy or mitigate the effect of the Event of Default or otherwise in connection with it;

c.  the Borrower's obligations hereunder and under each document to be executed by the Borrower hereunder rank and will rank at least *pari passu*, in priority of payment and in all other respects, with all other unsecured and unsubordinated indebtedness of the Borrower;

d.  The Borrower shall not without the prior written consent of Lender and with regards to any other transactions with similar nature, terms and conditions:

    (a)  create or permit to subsist any charge, mortgage, pledge, security interest or any other right of a third party in respect of (i) any of its present or future property, and/or (ii) any of its present or future other assets;

    (b)  sell, barter or otherwise alienate (including, without limitation, through any sale and leaseback and other off-balance transaction) any of its property or other assets, except for a sale or transfer for full value in the normal course of business of assets as mentioned under (a) (ii);

    (c)  guarantee or incur liability in any other way for the obligations and/or debts of third parties, whether due or not due, absolute or contingent; and the Borrower shall procure that none of its present or future subsidiaries or companies in which the Borrower holds or will hold the majority of the shares, will create any security interest or incur liability as described in the first part of this item and that such subsidiaries or companies shall accept the foregoing as their own obligation;

    (d)  redeem, assign, transfer, sell or in any other way dispose of any shares of the Borrower which are all pledged to the Lender as collateral for the loan amounts; and

    (e)  Any collateral packages held by the Borrower are pledged against the outstanding loan amounts and in case one collateral package is not sufficient to cover each exposure, a cross-collateralization concept applies to any additional collateral held in other receivables packages of the Borrower.

**42**

## ARTICLE 8.    EVENTS OF DEFAULT

1.    The total outstanding principal sum of the Facility together with accrued interest and any other charges due by the Borrower to Lender under this Agreement will become due and payable, without giving notice or observing any other formality, upon occurrence of any of the following events, in which case the Borrower will no longer be entitled to make any Drawdown under this Agreement:

a.    the Borrower shall default in the payment of principal, interest, arrangement fee or any other amount payable hereunder at the end of the Term or within 90 days (60 days notice period plus 30 days grace period) after the requested repayment request for a partial repayment has been requested honoring the 10% of outstanding loan amount limitation for partial redemptions per each monthly request prior to end of Term;

b.    the Borrower shall default in the due performance or observance of any other provision contained in this Agreement and such default shall not be rectified within a period of 10 (ten) days after Lender shall have given the defaulting party written notice of such default;

c.    the Borrower changes, or threatens to change, ceases or threatens to cease business aspresently conducted other than in the normal course of business or sells, transfers or otherwise alienates the whole or any substantial part of its property or assets, including revenues, whetherby one transaction or a series of transactions, related or not, without the prior consent of the Lender;

d.    the Borrower shall be unable, or admit in writing its inability to pay its debts as they mature, make an assignment for the benefit of creditors, or commit any act of bankruptcy, or any encumbrance takes possession or any order relating to dissolution, liquidation, bankruptcy or insolvency or for the appointment of a liquidator or receiver or judicial administrator or trustee or the levy of any execution shall be passed, commenced or made with respect to it or any of its assets;

e.    any adverse event or change shall have occurred in the economic or financial situation of the Borrower from which Lender shall conclude in its reasonable opinion, after having made the necessary investigations and after having notified the Borrower of the result of such investigations, that the ability of the Borrower to fulfil its obligations under this Agreement has been materially impaired;

f.    if the country in which the Borrower has its principal office announces or enters into rescheduling or restructuring of its debts, unless the Borrower's ability, as the case may be, to service and repay the Facility, shall remain unaffected thereby;

g.    a distress or execution or writ of seizure and sale or attachment is levied upon or issued against any of the property or assets of the Borrower representing a substantial part of such property or asset, which is not discharged within 14 (fourteen) days thereof;

h.    this Agreement, or any provision thereof is or becomes or is claimed to be, for any reason, invalid or unenforceable or at any time it is unlawful or impossible for the Borrower to perform any of its obligations hereunder or it is unlawful or impossible for Lender to exercise any of its rights hereunder;

43

i.      any redemption, assignment, transfer, sale or any other kind of disposal of any subordinated shares owned by the Borrower; or

j.      the change of Borrower's majority control without the prior specific written consent of Lender.

2.      If, pursuant to the above, Loan becomes fully due and payable, then, and at any time thereafter, the Lender may, by written notice to the Borrower, call for repayment of the Loan on such date as the Lender may specify in such notice whereupon the same shall become due and payable on such date together with any other sums then owed by the Borrower hereunder. The Lender also has priority over the equity investors in any future bankruptcy process in regards to receiving the repayment of what is owed to the Lender in accordance to the terms of this agreement.

3.      In the event that the Facility should become immediately due and payable as aforesaid, the Borrower will indemnify Lender for all losses, costs or expenses incurred by Lender, other than arising from gross negligence of willful misconduct. The determination of Lender (setting forth the basis of computation of such losses) shall, in absence of manifest error, be conclusive.

4.      Borrower expressly and irrevocably agrees with Lender, in view of the provision of item 1. (c) above, that all amounts owed by Borrower to any of the companies belonging to the Lender Group in view of agreements, contracts, obligations or operations other than the present one, regardless of the nature, conditions or original payment term of such other agreements, contracts, obligations or operations, shall also become immediately due and payable in the event of anticipated maturity of this Agreement, and Lender, or the interested company of the Lender Group, may, at its own discretion, take any and all measures deemed necessary to enforce its rights and its/their immediate payments, either against the Borrower, or against any possible guarantors thereto.

## ARTICLE 9.      SECURITY

1.      The obligation of the Borrower to repay the Lender under this Agreement shall be guaranteed by a deed of charge over all shares of the Borrower.

2.      The Borrower hereby undertakes and commits to executing, and having its shareholder execute the relevant deed of charge and all other related ancillary pledge documents and agreements, as well as providing for the necessary registrations, signatures and actions as to make such deed of charge fully valid and enforceable against the Borrower, upon request in written by the Lender, within the timeframe required by the Lender in said written request.

## ARTICLE 10.      TAXES

The Borrower shall pay all taxes, if any, which will be levied as withholding tax and which Lender can't set off as advance levy with taxes due by other reasons, as well as the costs of the enforcement of this Agreement. Costs of enforcement include the costs of legal assistance incurred.

**44**

## ARTICLE 11.  COMMUNICATIONS AND NOTICES

All notices and communications made hereunder by either party to the other, shall be in writing in the English language, by telex or by cable or by telefax to be confirmed in writing at addresses stated at the opening of page 1, or to such other addresses as may from time to time be notified in writing by either party to the other.

## ARTICLE 12.  MISCELLANEOUS

1. In respect of this Agreement and its implementation the Borrower irrevocably waives any claim as to court or arbitration proceedings and the enforcement of any awards, sentences, judgments, injunctions, decrees or court orders legally given or made in connection with such proceedings.

2. No failure to exercise and no delay in exercising, on the part of Lender, any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or future exercises of any other right, power or privilege. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

3. All payments to be made by the Borrower under this Agreement shall be made to Lender in United States Dollars at the account, which Lender may from time to time indicate. These payments made by the Borrower hereunder are considered to be firstly for costs and expenses, then for penalty fee, and default interest, if this is the case, and, lastly, for interest and principal, in that order.

4. The accounts of Lender shall be prima facie evidence of any amount, which the Borrower may owe from time to time to Lender pursuant to this Agreement, except in case of manifest error.

5. The Borrower is not entitled to assign any of the rights or obligations arising out of this Agreement.

6. Lender shall at all times be entitled to set-off all and any claims the Lender group has on the Borrower under this Agreement against any counterclaims of the Borrower.

7. This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same agreement.

8. This Agreement is subject to the laws of Cayman Islands. Jurisdiction is given to the Courts of the Cayman Islands.

9. This Agreement shall become effective when executed and delivered by Lender and Borrower and shall be binding in all respects upon the parties and their respective successors.

45

IN WITNESS WHEREOF the parties hereto, acting through their duly authorized representatives, have originally executed this Agreement on January 1st 2021, but are now on March 1st 2022 entering into this updated and amended Agreement which shall supersede and replace all prior documents and agreements, either in written or not, relating to this contractual arrangement between the Parties.

Borrower:

International Portfolio Allocation Ltd.
By: Dennis Klemming

Lender:

SPI Investment Fund SPC, for and on behalf of its SPI All Yields Fund (AYF) SP
By: Gareth Williams

46